1  Xavier Becerra, State Bar No. 118517
   Attorney General of California
2  Ismael A. Castro, State Bar No. 85452
   Supervising Deputy Attorney General
3  Judy Wong, State Bar No. 299990
   Laurie N. Adamson, State Bar No. 242795
4  Deputy Attorneys General
    1300 I Street, Suite 125
5   P.O. Box 944255
    Sacramento, CA 94244-2550
6   Telephone: (916) 210-6095
    Fax: (916) 324-5567
7   E-mail: Laurie.Adamson@doj.ca.gov
   *Attorneys for Xavier Becerra, Attorney General of*
8  *California, and Pat Leary, Acting Director of*
   *California Department of Social Services*
9
                IN THE UNITED STATES DISTRICT COURT
10
              FOR THE EASTERN DISTRICT OF CALIFORNIA
11

12

13

14 | **TEEN RESCUE, CARLTON WILLIAMS** | 2:19-cv-00457-JAM-EFB
   | **as an individual and on behalf of all others**
15 | **similarly situated,** | **DECLARATION OF IA LO IN SUPPORT**
   | | **OF DEFENDANTS' OPPOSITION TO**
16 | Plaintiffs, | **MOTION FOR TEMPORARY**
   | | **RESTRAINING ORDER AND**
17 | v. | **PRELIMINARY INJUNCTION**

18 | | Dept:        6, 14th floor
   **XAVIER BECERRA, Attorney General of** | Judge:       Honorable John A. Mendez
19 **the State of California, in his official** | Trial Date:  None Set
   **capacity, WILLIAM LIGHTBOURNE,** | Action Filed: March 13, 2019
20 **Director of the State Department of Social**
   **Services, in his official capacity, Butte**
21 **County Department of Children's Services**
   **Division ad DOES 1-50,**
22
   | Defendants.
23

24      I, Ia Lo, declare that the following is true and correct:

25      1.      I am employed by California Department of Social Services (CDSS), Community

26 Care Licensing Division, Sacramento Children's Residential Program, located at 2525 Natomas

27 Park Drive, Suite 260, Sacramento, CA  95833.  I have been employed with California

28 Department of Social Services since October 26, 2016.  I am currently assigned to the Sacramento

                                        1

1   Children's Residential Regional Licensing Office, and my job title is Regional Manager.  The

2   facts set forth herein are within my personal knowledge, to which I could and would testify

3   competently if called upon to do so.

4          2.     As a Regional Manager, I am familiar with the provisions of the California Health

5   and Safety Code and Title 22 of the California Code of Regulations regarding the requirements

6   for licensing and operation of children's residential facilities such as foster homes and group

7   homes for children.  I receive ongoing training regarding updates to licensing laws, regulations,

8   procedures and policies as needed.   I have performed numerous on-site facility evaluations,

9   witness interviews and conducted all aspects of investigation regarding licensed facilities.

10         3.     My job duties as a Regional Manager include, but are not limited to supervising

11  and monitoring staff: reviewing applications for licensure; recommending license

12  approval/denial; conducting criminal record and child abuse background checks; performing on-

13  site facility evaluations; conducting all aspects of investigation regarding complaints against

14  facilities; interviewing witnesses; working in conjunction with law enforcement and child

15  protective services; and recommending and preparing administrative actions to deny, revoke, and

16  suspend facility licenses and certifications.

17         4.     I am familiar with TEEN RESCUE, INC. DBA RIVER VIEW CHRISTIAN

18  ACADEMY (RVCA) and NEW DAY FOR CHILDREN, INC. (New Day) and because I

19  supervised and participated in the investigation of complaints of an unlicensed children's

20  residential facility operating as RVCA and New Day at 12069 Tintagel Lane, Whitmore, Shasta

21  County, CA 96096, APN: 034-270-001.

22         5.     I am duly authorized to review the investigation reports of CDSS regarding RVCA

23  and I reviewed those records in the course of my investigation.  The records were prepared by

24  personnel of CDSS, investigators, or persons acting under control of either, in the ordinary course

25  of the CDSS business at or near the time of the act, condition, or event.  It is the regular practice

26  of CDSS for an employee or representative with knowledge of the act, event, incident, order,

27  transaction, invoice, condition, photo, video recording, opinion, or diagnosis, to prepare these

28  records, or to transit information thereof to be included in such records.  The records were made

2

1  at or near the time of the occurrence of the matters set forth by, or from information transmitted

2  by, a person with knowledge of those matters. My review of the CDSS business records disclosed

3  the following.

4      6.    On January 26, 2010, CDSS received a complaint that RVCA (formerly Julian

5  Youth Academy[1]) was providing therapeutic counseling services and 24-hour supervision to

6  youth.  The complaint contained allegations of extreme measures of discipline used on youth,

7  including isolation, withholding food, Stockholm treatment, and shock collars.  RVCA was also

8  reported to engage in activities typical of licensed children's residential facilities, including the

9  control of medications, screening health complaints, arranging all medical appointments and

10  treatments, providing therapeutic services and a behavior program, as well as filtering of mail and

11  visitors.

12      7.    On January 31, 2011, LPA Julie Darden received a complaint from a Confidential

13  Complainant who reported becoming aware of New Day for Children while attending a freedom

14  summit in the field of sex trafficking.  During the summit, New Day reported its program serves

15  females ages 10 – 17 who are victims of sex trafficking, and that the New Day facility was

16  located at an undisclosed location in Northern California.

17      8.    On February 9, 2011, LPA Troy Hetherwick attempted a site inspection.  Upon

18  arrival, LPA Troy Hetherwick was denied access by a female staff member whom talked to Phil

19  Ludwig on the phone.

20      9.    On October 22, 2011, CDSS LPA Andrea Betram-Mueller was discussing with a

21  woman (name unknown) a non-profit organization called "Run for Courage Inc."  "Run for

22  Courage Inc." was formed by this woman and her friends to provide funding to organizations that

23  help child victims of the sex trafficking industry.  This woman identified the beneficiaries of the

24  2011 Run for Courage, one of which was New Day for Children which she indicated was a

25  residential treatment program for girls who are victims of the sex trafficking industry.

26      10.   On November 8, 2011, CDSS was made aware that news media reported the death

27  _____

[1] RVCA was previously known as Julian Youth Academy (JA).  As such, this declaration and some of CDSS documents may refer to RVCA as JA.

28

1  of an infant on the grounds of RVCA at 12069 Tintagel Lane, Whitmore, Shasta County, CA

2  96096. (See article at https://krcrtv.com/archive/update-shasta-county-woman-arrested-for-

3  killing-secret-baby-infant-found-mummified, attached to this declaration as **Attachment D**).

4  According to the news report, the baby girl was born on September 19, 2011, to a RVCA staff

5  and former student Jessica Bradford. Ms. Bradford allegedly concealed her pregnancy from

6  everybody, gave birth under the deck outside her dorm room, hid the baby girl in an empty

7  structure on the property for four days, and hid her little corpse in a laundry basket after she died.

8  In 2014, an article found on https://krcrtv.com/archive/mother-in-mummy-baby-case-gets-25-to-

9  life reported that Ms. Bradford was convicted of first-degree murder and was given a life

10  sentence.

11       11.     On November 29, 2011, CDSS filed an application for an inspection warrant so

12  they could continue the investigation. CDSS's application was granted, and on December 5, 2011

13  and December 9, 2011, CDSS conducted a site inspection during the execution of inspection

14  warrant. They interviewed clients and staff, and collected client records including CPS history,

15  and some educational and admission records, as well as facility records including staff meetings

16  on behavior interventions. Additionally, CDSS collected website information from New Day and

17  RVCA's websites, interviewed parents, and collected other agency information.

18       12.     My review of the file showed that on January 24, 2012, Licensing Program

19  Manager (LPM) Julie Darden received a new complaint from a parent of a child recently

20  discharged from New Day. The parent reported that her daughter was discharged without

21  warning, and that staff attempted to send her home by bus despite her history of AWOL and

22  prostitution. The parent stated that the program was different than how it was presented to her:

23  she was told that they had an educational and church program, a school, counselors on campus,

24  fully qualified staff who were not former RVCA clients, and that her daughter would receive

25  regular counseling. In reality, her daughter only received phone consults with a therapist with

26  staff listening in, the school was not accredited, the staff were mostly former RVCA clients, and

27  the staff took her daughter off ADHD medication without consulting her.

28

13.    On July 6, 2012, LPAs attempted to follow up on the health and safety concerns submitted to CDSS. CDSS requested interviews with staff and clients. Program Directors stated that they would not allow interviews without a warrant and asked the LPAs to immediately leave the premises.

14.    On July 30, 2012, LPA Susan Sadler conducted an interview with a clinician, Jeanette Vo-Vu, at a mental health facility in Redding. Ms. Vo-Vu stated that she was concerned that RVCA staff were not trained to assess or assist students with mental health problems, as the staff were not provided with any training and did not have procedures for medical treatment of students and did not know to handle mental health problems with their students. One RVCA client was assessed at Ms. Vo-Vu's mental health facility three times within six months. The client told RVCA staff about his suicidal ideations and they did not offer him any help, and the student was adamant that he did not want to return to the RVCA. The student had attempted suicide on the second visit and again on the third visit and was brought back to the facility with cuts on each of his arms from his shoulders to his wrists. The student told staff he would continue to hurt himself if he returned to RVCA and was eventually hospitalized and sent to an out-of-state facility for care.

15.    On November 14, 2012, a meeting was set up between Mr. Ludwig and CDSS at RVCA, 12069 Tintagel Road, Whitmore, CA. Mr. Ludwig allowed LPM Julie Darden and Program Administrator Angela Valdez to interview staff and clients chosen at random, but only using "predetermined questions" agreed to by Mr. Ludwig and Mr. Ludwig was present at all the interviews. During the meeting, the interviewees appeared to have been coached prior to the meeting or intimidated or otherwise influenced by Mr. Ludwig's presence. The answers given by interviewers were inconsistent with prior evidence obtained by CDSS with respect to the subject of whether New Day and RVCA provide counseling or therapeutic services, although they did confirm a behavioral program.

16.    On March 2, 2015, CDSS received a complaint after staff at RVCA reported to Shasta County Sheriff's Department that a female client was sexually assaulted on several occasions and "strangled" by another female client at the facility. Both clients were victims of human

trafficking, and at least one of the girls was on probation out of San Diego County.  A suspected child abuse report (SCAR) detailing the incident was submitted by the Shasta County Sherriff's Department to CDSS.

17.   On May 4, 2016, LPA Kirk Marks attempted to conduct an on-site investigation but was denied access to the facilities, staff, and youth by RVCA staff.  No inspection of RVCA's campus was conducted.

18.   On June 26, 2015, CDSS' Regional Manager met with Mr. Ludwig in an attempt to resolve whether the facility was functioning as a group home.  Based on the information provided, CDSS could not determine if RVCA was operating as a group home, and closed the investigation, concluding that the findings were inconclusive, although the allegation may have happened or is valid, there is not a preponderance of evidence to prove that allegation.

19.   On September 11, 2018, CDSS received a referral regarding a Buzzfeed article entitled "Scared Straight," published on September 8, 2018.  The article contained interviews with several former residents of RVCA and employees, who alleged that RVCA:

   (a) Punished residents for saying they were gay or bisexual;
   (b) Punished residents by using a "no talk" and "no touch" rule, which prohibited residents from talking to each other, making eye contact, or having any form of human contact;
   (c) Cared for children with mental illness such as depression, who have experimented with drugs, or run away from home;
   (d) Failed to comply with mandated reporting requirements and did not report claims of physical or sexual abuse by parents or other adults;
   (e) Failed to train staff to handle sexual or physical abuse claims;
   (f) Punished residents who attempted suicide or harmed themselves;
   (g) Limited residents' diet to peanut butter sandwiches and water for days or weeks at a time as a punishment;
   (h) Failed to post its rules and altered them at a moment's notice;
   (i) Decided when residents could speak to their parents and read and censored residents' incoming and outgoing letters.

20.     On October 10, 2018, LPA David Leach conducted online research by viewing Teen Rescue's Facebook page at https://www.facebook.com/TeenRescue/, and found a page of reviews. LPA David Leach reached out to one of the authors via Facebook messenger, who was former client of RVCA's southern California campus from February 16, 2000 to June 18, 2001. The former client stated that she was taken from her home one night between 4 a.m. to 5 a.m. by two men who entered her bedroom and handcuffed her. When she arrived at RVCA, she was not allowed to speak to anyone for three days, and nobody could speak to her. Each client had a badge they wore on their uniform which indicated whether a client was on the "no talk" rule. She was put in the program because she had been caught with an empty vodka bottle and two packs of cigarettes in her backpack. She stated that she went AWOL from the facility once after being blamed for something she hadn't done, and when she returned to the facility she was placed on the "no talk, no touch" rule for a while. Staff watched the kids all the time, and if two girls became close friends, conversed, and hung out, staff would put them on "no talk" to discourage the friendship. Staff also encouraged other clients watch each other and alert staff if two people were becoming too close. She also stated that she was later diagnosed with bi-polar disorder, and wondered whether things would have been different if she had been evaluated earlier in her life.

21.     On October 10, 2018, CDSS Investigator Christine Ferris interviewed a former RVCA (then known as Julian Youth Academy) client who resided at the Julian Academy campus from May 2005 to March 2007. She was a troubled teen who ran away from home repeatedly, and her parents threatened to send her "somewhere" if she didn't stop her behavior. On the morning she was sent to RVCA, she woke up with a large man and woman in her bedroom. They drove her to her to RVCA and she was "strip searched," and her bag was searched. Her parents became aware of RVCA through a therapist she was seeing and recommended that she attend to improve her behavior.

22.     According to the former client, there were approximately forty girls at the location and four "modular" trailers on the property. She described being punished by "writing lines," loss of points, restricted conversations, running laps, and the "no talk rule." She recalled writing the line "I am valuable in the kitchen and will pay attention" three thousand times after working

7

1   in the kitchen and messing something up.  As the girls gained staff's confidence, they would

2   attain a certain level of points and be considered "superior" and called "uppers."  New girls or

3   girls with problems would be called "lowers or downs."  The level system had levels from "A –

4   L4" and upper girls were placed in charge of lower girls and were responsible for their behavior,

5   and the girls were expected to write notecards notifying staff of anyone who did something

6   "against the rules."  She reported the rules were not written and were arbitrary, but they learned

7   "through punishment and the others girls" what to do or not do.  She stated that the point system

8   created a "tremendous amount of anxiety."  Every morning the girls would be given their

9   "progress reports" showing how many points they had lost or gained the day before, and the girls

10   had to attain a certain level of points to "graduate" from the program and go home.  They were

11   allowed to write and receive letters from their parents, but the letters were read by staff prior to

12   being sent, and parents were warned that their children would "say anything" and to "read

13   between the lines of their letters" because their child was "trying to manipulate them."

14        23.     The former client stated to CDSS Investigator Christine Ferris that she was

15   molested prior to her arrival at RVCA and informed her parents and a RVCA staff member who

16   was called a "therapist," Ms. Hiesterberg, but "nothing was done."  It is important to note that this

17   may have contributed to the behaviors that led her parents to seek placement at RYCA.  However,

18   she stated that she would not recommend RVCA to anyone as it was a "horrible" experience" that

19   caused her "severe social anxiety" due to the lack of "normal social relationships" with people,

20   family, and friends.  She stated that the program broke the girls down spiritually and emotionally

21   and it was too extreme.

22        24.     On October 15, 2018, Investigator Christine Ferris interviewed another former

23   RVCA client who attended RVCA from May 5, 2001 to October 15, 2002.  She reported that

24   child protective services had been called regarding her "abusive household" and she was sent to

25   RVCA to "avoid being a ward of the court."  She was taken to RVCA by a social worker and told

26   by RVCA staff member Mrs. Nardina Light that she would be there for one and a half years, she

27   would not see her friends, and would only be allowed to see her parents after two months and

28   other family after one year.  There would be no communication other than monitored letters to

8

and from her parents and she would "lose all her belongings." The points system and level system were explained to her, and she was told that once a certain level of points were earned, "liberties" would be returned like the "right to speak." The rules were not written and she learned what was acceptable from the other girls. Girls were punished using the "no talk" rule, which was a "type of solitary confinement," as nobody could speak or make eye contact with you. Staff and girls acted as though "you did not exist." Staff were also trained that the girls were master manipulators and may or may not have assisted them based on whether they believed their needs were valid or not. They would also be made to run to the "point of physical exhaustion," and they were also punished by physical labor. She was made to stack a "load of logs approximately five feet high, then move it up and down a hill nineteen times." Girls were also punished by writing lines that were "insulting" and "demoralizing" thousands of times.

25. The program consisted of schooling which entailed working in work books - but "no staff was a trained teacher" – prayer sessions, Bible reading, and chores. The former client stated that she observed girls arriving in handcuffs. She was also familiar with the FACESS program where Mr. Ludwig "supposedly" rescues children from sex trafficking and rehabilitates them to "re-enter society." She stated that sometimes girls would be transferred to other facilities, which is common "in behavior modification programs as children are shuffled to other places."

26. After two months in the program, her parents were able to visit her at the campus but there was a "baby monitor" in the room so staff could listen to their conversation. Parents had been "conditioned" to believe everything the girls said was a "lie" so nobody could disclose any problems to their parents. On one occasion, she had what she described as an epileptic grand mal seizure and fell down a flight of stairs. Her parents were not notified. Mrs. Light then "faked" a call to her parents and "pretended" to explain the situation. Mrs. Light hung up the phone and told her that her parents did not want to speak with her and were not coming to see her and knew that they had "everything under control." She later learned from her mother that no call was ever made.

27. The former client stated that she did not rebel against the punishments, and Mr. Ludwig suggested an "exorcism" be conducted on her because it was "unnatural" that she was not

9

1    crying. However, her mother denied Mr. Ludwig permission to do the exorcism.

2         28.    The former client also stated that staff are living a double life and are doing "illicit

3    drugs, mostly cocaine" on campus and believe that "an end of time war is coming between them

4    and the government." She heard that staff are "stockpiling weapons."

5         29.    Following the 2018 referral and CDSS' preliminary investigation, CDSS requested

6    representation from the Attorney General's Office to obtain an administrative inspection warrant,

7    so that CDSS could inspect New Day and RVCA and determine if they were operating without a

8    license in violation of the Community Care Facilities Act.

9         30.    On January 18, 2019, I participated in an unlicensed care investigation on the

10   campus of RVCA. Due to the repeated refusal of RVCA to allow CDSS to conduct complaint

11   investigation interviews of staff or youth, entry on to campus was obtained via an inspection

12   warrant issued on January 8, 2019 by Shasta County Superior Court Judge Stephen Baker. CDSS

13   had safety concerns about executing the warrant as a result of disclosures that indicated staff on

14   campus does not trust government and have weapons including handguns, AR-15 rifles and other

15   firearms. As a result of CDSS's safety concerns, California Highway Patrol assisted CDSS with

16   the service of the warrant, a prospective sweep of the grounds, locating and securing any weapons

17   and gun safes, and remained on stand-by to ensure weapons were not accessed while CDSS

18   carried out the inspection.

19        31.    During the January 18, 2019 inspection I interviewed one RVCA staff member,

20   office manager Andy Rodrigues. CDSS also attempted to interview the rest of the RVCA staff to

21   get their perspective, confirm youth statements and to gather additional information regarding the

22   program because the Inspection Warrant signed by Judge Baker authorized interviews of all staff.

23   However, RVCA staff refused to speak to us even though we provided a copy of the warrant

24   showing that the scope of the warrant included interviews of staff. When we asked staff why they

25   were refusing to speak to us in spite of the warrant, we were told that Phil Ludwig directed all

26   RVCA staff to refuse to speak to us. In fact, the only reason we were able to interview RVCA

27   office manager Andy Rodrigues is because we completed her interview before staff were told not

28   to talk to us.

1    34.    Statements by RVCA staff and youth confirmed that RVCA supervises youth at all

2    times and directs all youth activities. On January 18, 2019, Staff Rodrigues reported to me and

3    CDSS Licensing Assistant Program Administrator Lenora Scott that her primary duties include

4    handling the day to day operations of student schedules and activities, filing student and staff

5    information in files, and occasionally leading and participating in activities with the youth.  Staff

6    Rodrigues provided us with a detailed schedule of the youths' daily activities which governs all

7    activities from rising at 7:30am to bedtime.  RVCA Staff Rodrigues confirmed that Teen Rescue,

8    Inc. and New Day for Children, Inc. also has a program on campus for youth who are

9    "commercial sexual exploitation children" (CSEC), and that these CSEC girls have even higher

10   needs than the children at RVCA.  She stated that CSEC girls get more "activities" that the other

11   youth, including horse camp, therapy and a weekly chiropractic appointment. RVCA Staff

12   Rodrigues confirmed that RVCA staff is responsible for storing and logging medications,

13   although there is no nurse on campus, and that RVCA is responsible to pick up prescriptions for

14   the youth.

15   35.    The 29 youth interviewed on January 18, 2019 by CDSS staff all made consistent

16   statements that confirmed that RVCA provides care and supervision as defined in Title 22

17   Regulations section 80001(c)(3)(B)-(H). All youth reported to CDSS staff that RVCA staff

18   provides direct care and supervision to youth at all times, including overnight, and directs all

19   youth activities. Youth described detailed house rules which are posted in the dorms, and their

20   daily schedules and activities that included school, meals, physical activities and other routine

21   activities, and that all youth are on a behavioral system and monitored throughout the day for

22   points. CDSS workers personally observed these "house rules" or "dorm rules" posted in the

23   dorms.  Youth reported there is never a time when staff are not supervising except inside the

24   shower stalls, and that at night staff monitor the youth through a video feed and hourly room

25   checks. Youth reported that RVCA also controls youth's ability to talk to *or even look at* peers,

26   and that there are "restricted communication" or "RC" times throughout the day. Youth reported

27   that all types of communications with their parents are restricted and monitored.  All youth

28   reported that RVCA centrally stores youths' medications, including psychotropic medications

11

1    Zoloft, Clonidine, Lexapro, Seroquel, Oxcarbazeine, Zinco, Sertraline and Vyvance, and that

2    RVCA distributes medications to the youth and keeps a daily medication log. All youth reported

3    to me that RVCA arranges and assists with transportation to all medical and dental care and picks

4    up their prescription medications. The youth told CDSS that RVCA takes, stores and maintains

5    their property upon admission, and that they are not allowed to keep all of their personal items.

6    Youth reported that RVCA plans, schedules and monitors all meals and has placed youth on

7    peanut butter and bread-only diets for many months at a time, as recently as October 2018.

8    Youths' ability to access a phone is limited and youth reported that they would be unable to call

9    9-1-1 or the authorities if needed

10         36.    Witness statements from the January 18, 2019 interviews showed that the school's

11   function is not educational only, as required by Title 22 Regulations, Division 6, section

12   80007(a)(6)(E), for the facility to be exempt from licensure. All youth consistently reported that

13   the school's focus is behavior and not education, and all of the youth reported being placed at

14   RVCA for behavioral reasons. No youth reported being placed at RVCA for academic reasons.

15   Both RVCA Staff Rodrigues and all youth reported that "school" is independent study online, and

16   they must sit quietly in front of a computer during school hours to do the independent study.

17   Youth reported there are no teachers teaching "school." Staff Andy confirmed that staff

18   qualifications to work at RVCA are that you have a high school education, be 21 years of age, be

19   DOJ fingerprint cleared, have a good driving record and be a Christian. During a prior

20   investigation of RVCA in 2011 -12, CDSS discovered that the majority of staff hired at RVCA

21   were former students. CDSS confirmed that around September of 2011, 23-year-old staff member

22   and former student named Jessica Bradford had secretly given birth to a baby, hid the baby at

23   RVCA, then let the baby die of starvation or thirst there on campus.

24         37.    In addition to the information provided about the "school" by RVCA Staff

25   Rodrigues, several youths reported to CDSS they are struggling with school work but stated there

26   is no RVCA staff to help them. My review of files on campus did not confirm that there was a

27   single certificated teacher on campus, although RVCA Staff Rodrigues stated that there is one

28   volunteer teacher named Karen Armstrong, her mother, who teaches literacy. However, all of the

12

1  youth reported there were no teachers and none of them mentioned a teacher named Karen

2  Armstrong. One youth reported to CDSS it is "not really school" and that you do not get

3  appropriate materials for the assignments, and that for example, in science you are supposed to do

4  experiments but since there is no materials and no teacher, you have to "guess" the answers.

5  Youth stated that although [in addition to the monthly fee their parents pay] their parents can pay

6  an extra fee for an outside tutor who comes for 1 hour per week, several had requested a tutor and

7  had not received any tutoring.  Youth also provided detailed descriptions of RVCA's behavior

8  modification or "levels" system, where throughout the day youth earn or lose points based on

9  behavior. Youth receive a daily evaluation sheet with points gained or lost based on behavior, not

10 academics. Youth reported that the only actual "classes" provided on campus by a real person are

11 for emotional health, anger management or boundaries. In addition, more than one youth reported

12 that they were not allowed to attend "school" when they misbehaved.

13        38.        Witness statements, the Teen Rescue, Inc., New Day for Children, FACESS aka

14 Together Freedom websites and RVCA records obtained on January 18, 2019 also showed the

15 program is designated as providing rehabilitative or treatment services and that the facility

16 accepts children who are in need of community care facility services, in violation of Title 22

17 Regulations, Division 6, section 80007(a)(6)(F) and (G). Youth provided CDSS detailed

18 descriptions of RVCA's program as a behavior modification or "levels" system, where

19 throughout the day youth earn or lose points based on behavior. Youth receive a daily evaluation

20 sheet with points gained or lost based on behavior. Youth reported there is someone named "Ms.

21 Leann" and "Ms. Posey" that lectures them or provides individual counseling on mental health

22 issues on campus.  Staff Rodrigues also stated that there is someone named "Natasha Posey" who

23 does counseling on campus, however, CDSS was unable to confirm with the Board of Behavioral

24 Sciences that a "Natasha Posey" or anyone with a similar name has a license to engage in

25 counseling. Several youths reported that they had histories of mental health issues, that RVCA

26 was aware and that they were on psychotropic medications.  Youth reported receiving therapy

27 from counselors both on campus and off campus.  Youth also reported that when they had been

28 placed at RVCA it was for drug or alcohol addiction, however, they did not disclose any

13

1    treatment they had received from RVCA for the addictions. Youth reported that while there are a

2    few religious components to the program, such as having their Bible open during "devotional

3    time," youth are not required to read the Bible. No youth reported that the focus of the program is

4    religious; all youth reported that the focus of the program is behavior. Youth reported that RVCA

5    does not have a church on campus and they do not attend actual "church," but rather, RVCA

6    offers "religious videos" that the youth can watch to get behavior points. RVCA Staff Rodrigues

7    reported that the program is an 18-month long program and confirmed restricted visits with

8    parents.

9          39.     My review of records obtained on January 18, 2019 in the RVCA files showed the

10   following additional evidence that RVCA's function is not educational only, that the program is

11   designated as providing rehabilitative or treatment services, that the facility knowingly accepts

12   children who are in need of community care facility services, and that the facility accepts wards

13   of the juvenile court, all of which are in violation of Title 22 Regulations, Division 6, section

14   80007(a)(6)(E) - (G) and (I), as follows:

15   •   In answer to the question "WHY DO YOU SEEK PLACEMENT AT RVCA?" on
         the RVCA student application forms, parents or guardians consistently wrote that
16       child is out of control, using drugs or alcohol, experiencing mental health issues,
         truancy from school, or engaging in other at-risk behaviors. No applicants said
17       they sought placement to address education.

18   •   I reviewed youth records that confirmed several youth have mental health
         diagnoses including but not limited to Depression, Anxiety, Bipolar Disorder and
19       Conduct Disorder, and many youth are on psychotropic medications.

20   •   Youth progress in the program is evaluated based on behaviors, not academics.

     •   The RVCA application packet includes a section about the youth's history that
21       includes several pages of extremely invasive questions about the youth's
         behaviors, sexual experiences, use of birth control, dating, relationships, STDs,
22       mental health conditions, use of drugs or alcohol and contact with the child
         welfare/probation system. Almost none of the questions about the youth are about
23       the youth's academics.

24   •   There were no records in the youths' files regarding educational assessments,
         standards or performance.

25   •   Communications with parents in the files were primarily regarding behavioral
         needs, not education, and notes from Monthly Parent meetings indicate RVCA
26       announcements were about behavior progress, mental health issues, setting
         boundaries, anger and parenting tips.

27   •   Staff filled out incident reports (IRs) not regarding educational issues, but
         regarding "emotional outbursts."

28   •   Student files had "Lesson Homework" sheets filled out by youth all of which

                                          14

related to behavioral goals, not academics.

- One or more youth at the facility are on juvenile probation and have probation officers who visit or monitor their placement at RVCA. (Staff Rodrigues also confirmed this to me.)

40.     Of concern to the Department is that youth statements taken on January 18, 2019 also showed that youth's rights are likely being violated and that RVCA's staff engage in conduct that is a risk to the health, welfare, or safety of youth in care, which is the type of conduct that the Department is mandated to monitor and prevent in community care children's residential facilities (*see* Health and Safety Code section 1558(c).) The evidence gathered warrants immediate action by the Department and the youth's health, safety and welfare would be at significant risk of harm if the Department was prohibited or restrained from pursuing an unlicensed care action and requiring RVCA to obtain a license. Namely, several youths in care reported past and current suicidal thoughts for which they were not receiving any treatment. More than one youth stated that when they had reported to RVCA staff they wanted to kill themselves, the youth were denied access to a counselor because they had not "earned [behavior] level C." Another youth reported feeling "trapped" and that no one is listening to him, and that he needs a counselor. Another youth reported being refused any counseling or support besides prayer. Several youths reported that if they make "poor behavior choices" RVCA has placed them on a restricted diet of two slices of bread with peanut butter inside, and two youth reported being placed on this peanut butter and bread diet for 6 or 7 months as recently as October 2018. Youth reported their shoes are locked up when not in use so that they cannot run away.  Youth reported that if they run away from campus RVCA confiscates their shoes and gives them flip flops (open toe rubber sandals), and CDSS staff personally observed one youth wearing flip flops and socks on a very cold day in January, because his shoes had been confiscated by RVCA.  At least one youth reported being forced to go outside at night in the cold and wait there up to 30 minutes for misbehavior.  It should be noted that the campus is located in the foothills or mountains of Northern California's Shasta County, and at night temperatures can be at or near freezing.

41.     In addition to the evidence showing the health and safety concerns identified in the immediately preceding paragraph, more than one youth reported to CDSS that when physically ill

15

1  or hurt, they were denied access to a doctor and instead given essential oils or "home remedies."

2  CDSS obtained student records confirming youth are being physically restrained or engaging in

3  physical altercations with staff for not complying with staff directions, and CDSS did not find in

4  the files or during interviews of staff or youth any evidence that staff had any training or

5  education on de-escalation techniques or how to properly restrain someone so that no one gets

6  hurt, such as the training required for staff at children's residential facilities (Title 22 Regulations,

7  Division 6, section 84365 – Emergency Intervention Staff Training).  Several youths reported to

8  CDSS that if they make "poor behavior choices" RVCA has placed them on a restricted diet of

9  two slices of bread with peanut butter inside, and one youth reported being on this peanut butter

10  and bread diet for 4 to 6 months straight.  Youth reported that they have had RVCA "take away

11  school" for misbehavior.  All youth reported that all types of communications with their parents

12  are restricted and supervised, RVCA opens and reads all youth mail to and from their parents, and

13  at least one youth reported that he was required to "re-write" a letter to his parent because RVCA

14  did not like the content. Staff Rodrigues confirmed to me that staff monitor all youth phone calls.

15  Youth reported that they do not have unsupervised access to a phone and reported they would not

16  be able to make a private call to 9-1-1 or the authorities if needed due to an emergency or abuse.

17      42.      Based on the complaint investigation and my review of the investigation evidence

18  collected to date, it is my opinion that Teen Rescue, Inc., New Day for Children, Inc. and

19  FACESS aka Teen Triumph, are operating unlicensed community care facilities that provide or

20  hold themselves out as providing care and supervision, a treatment and rehabilitation program for

21  at-risk youth, medication management, assistance with obtaining and transportation to medical

22  and dental care, therapeutic counseling group classes on behavior issues and a strict behavior

23  modification program, and that the population they serve is at-risk youth. RVCA holds itself out

24  as providing a program to treat youth with at-risk behaviors and knowingly accepts youth with a

25  history of mental health conditions, drug or alcohol addictions, a history of being sex-trafficked,

26  and criminal activity, including youth they know are currently on criminal probation and being

27  monitored by a county probation officer.  However, it is of serious concern to the Department that

28  we did not find any evidence of staff training, education or experience that would typically be

16

1   expected for a treatment program for youth with any of these behaviors, conditions or histories.

2   In fact, the Department's recent activities related to implementation the Continuum of Care

3   Reform legislation[2] that has reformed all children's residential programs under the Community

4   Care Facilities Act indicate that programs that do not have trauma-informed practices, and that do

5   not have staff with the proper training, education or experience, may do more harm than good to

6   children in care.

7       43.   It is my opinion that pursuant to Health and Safety Code sections 1502(a), 1503.5

8   and 1508, and Title 22, California Code of Regulations, Division 6, section 80006(c), the

9   Department was required to investigate Teen Rescue, Inc. provides to see whether they are

10  operating an unlicensed community care facility.  Furthermore, based on the findings from the

11  investigation, the Department's actions in issuing a Notice of Operation in Violation of law was

12  necessary and justified in order to protect the health, safety and well-being of vulnerable youth in

13  care, pursuant to the Department's mandates at Health and Safety Code Sections 1540, 1540.1,

14  1541, 1543 and 1547.

15      44.   On April 2, 2019, based on the evidence gathered in CDSS' inspection showing that

16  Teen Rescue is currently operating a community care facility without a license, CDSS issued

17  Notices of Operation of Violation of Law (NOVLs) to Teen Rescue, New Day for Children,

18  FACESS, and Together Freedom.  The NOVLs states that operation without a license could result

19  in civil and/or criminal action being taken in accordance with California Health and Safety Code

20  sections 1540, 1540.1, 1541, 1543, and 1547.

21

22

23

24

25

26

27

28

---

[2] AB 403, Stats. 2015, Ch. 773; AB 1997, Stats. 2016, Ch. 612; AB 404, Stats. 2017; AB 1930. Stats. 2018, Ch.910.

1    I certify under penalty of perjury under state and federal laws that the foregoing is true and

2  correct.

3    Dated:  April 9, 2019 and signed at the CDSS Office 2525 Natomas Park Drive, Suite 260,

4  Sacramento, CA 95833.

5

6                                                     Ia Lo
                                                    CDSS Regional Manager
7  SA2019101170
   13619652.docx

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18